THE LAW OFFICE OF ROBERT J. BERNSTEIN
ROBERT JAY BERNSTEIN (RB 4230)
43 West 43rd Street, Suite 39
New York, New York 10036
Email: rjb@robert-bernsteinlaw.com
Telephone: 203-253-0353

*Attorney for Plaintiff*
Media Creature Properties LLC

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MEDIA CREATURE PROPERTIES LLC, a California Limited Liability Company,<br><br>Plaintiff,<br><br>vs.<br><br>CODIGO PUBLISHING, LLC, a Delaware Limited Liability Company, individually and doing business as FANIA MUSIC (BMI) and FANIA SONGS (ASCAP); CODIGO MUSIC, LLC, A Delaware Limited Liability Company; DOWNTOWN MUSIC PUBLISHING LLC, a New York Limited Liability; DOES 1-5; and ABC CORPORATIONS 1-25,<br><br>Defendants. | Case No. _____<br><br>**COMPLAINT FOR COPYRIGHT INFRINGEMENT, BREACH OF CONTRACT, AND DECLARATORY JUDGMENT**<br><br>Demand for Jury Trial |

Media Creature Properties LLC, through its undersigned attorney, alleges as follows:

### JURISDICTION AND VENUE

1. This is an action for infringement of copyright pursuant to 17 U.S.C. § 101 et

seq., and for breach of contract under New York State law.

2. Subject matter jurisdiction is conferred on the federal claims for copyright

infringement by 17 U.S.C. § 501, and 28 U.S.C. §§ 1331 and 1338, and on the related

declaratory judgment claim by 28 U.S.C. § 2201.

3.     Supplemental subject matter jurisdiction is conferred on the state law claim by 28 U.S.C. § 1367(a) because it is so related to the federal claim as to form part of the same case or controversy and on the related declaratory judgment claim by 28 U.S.C. § 2201.

4.     Subject matter jurisdiction is also conferred on the state law claim by 28 U.S.C. §§ 1332 because the amount in controversy exceeds $75,000 and the parties to the breach of contract claim are citizens of different states.

5.     The actions of the defendants complained of herein took place within this jurisdiction and Defendants may be found within this judicial district. Venue is proper under 28 U.S.C. §§ 1391 and 1400(a).

6.     This court has personal jurisdiction over defendants Codigo Publishing, LLC and Codigo Music, LLC pursuant to NY CPLR § 302(1) and (2), and Fed. R. Civ. P. 4(k)(1)(A).

7.     This court has personal jurisdiction over defendant Downtown Music Publishing LLC pursuant to NY CPLR § 301 and Fed. R. Civ. P. 4(k)(1)(A).

## FIRST CLAIM FOR RELIEF AGAINST ALL DEFENDANTS

## Copyright Infringement of the Musical Composition *Quimbara*

### Parties

8.     Plaintiff Media Creature Properties LLC ("MCP") is a limited liability company organized under the laws of the state of California, with its principal executive office at 1107 Fair Oaks Avenue #525, South Pasadena CA 91030.

9.     Upon information and belief, defendants Codigo Publishing, LLC ("Codigo Publishing") and Codigo Music, LLC ("Codigo Music") -- sometimes referred to collectively herein as "Codigo" -- are limited liability companies organized under the laws of the state of

Delaware, with their principal executive offices located at 5400 NE 4th Court, Studio 1A,
Miami, FL 33137.

     10.     Upon information and belief, defendant Downtown Music Publishing LLC is a
Delaware limited liability company with its principal executive office located at 485 Broadway,
3rd Floor, New York, NY 11013.

     11.     Plaintiff does not know the true names of the individuals, corporations,
partnerships or other entities sued and identified herein as Does 1 through 5 and ABC
Corporations 1 through 25. Plaintiff alleges, upon information and belief, that these defendants
are liable to Plaintiff under the federal copyright infringement claims for the relief set forth
below, and requests leave of this Court to amend this Complaint when the true names of said
Defendants are discovered.

### The Creation, History and Continuing Economic and Cultural Importance of the Infringed Work:  The Musical Composition Entitled *Quimbara*

     12.     Prior to May 22, 1974, Luis Rios Cepeda a/k/a Junior Cepeda ("Cepeda"), then a
young Puerto Rican songwriter, created the composition *Quimbara*.

     13.     Unfortunately, Cepeda was felled by a knife wound on that date and did not live
to see the monumental success of his creation.

     14.     In fact, neither Cepeda nor his heirs have ever received a penny from Fania Music
Publishing ("Fania") nor its successor, Codigo Publishing, despite the great and ongoing
commercial success and cultural acclaim garnered by Cepeda's song.

     15.     *Quimbara* was one of 15 songs Cepeda assigned to Fania pursuant to a music
publishing agreement dated November 1, 1972 (the "1972 Agreement"). In 1974, *Quimbara*
became hugely popular upon its release on the hit album entitled "Celia & Johnny" (Celia Cruz
and Johnny Pacheco) and was also released as the lead single from that album.

3

16.     "Celia & Johnny" has been honored by *Billboard* as the number 11 album in a list of "The 50 Greatest Latin Albums of the Past 50 Years"

(https://www.billboard.com/photos/6686047/50-most-essential-latin-albums-past-50-years). As the lead single released from that album, *Quimbara* has contributed most significantly to its success.

17.     Celia Cruz herself has been recognized by *Billboard* as the number 11 artist in its list of "The 30 Most Influential Latin Artists of All Time"

(https://www.billboard.com/photos/6546212/most-influential-latin-artists); and her 1974 recording of *Quimbara* with Johnny Pacheco, widely recognized as one of her signature songs, is listed as the number 4 on *Billboard's* list of "10 Eternal Celia Cruz Songs"

(https://www.billboard.com/articles/columns/latin/7865862/ten-eternal-celia-cruz-songs)

18.     Contemporaneously, *Quimbara* is still recognized for its cultural importance and commercial success, including without limitation its televised performance by Jennifer Lopez at a tribute to Celia Cruz during the 2013 American Music Awards and as part of her nightly setlist "All I Have" residency at the Las Vegas Zappos Theatre during 2016, 2017 and 2018.

19.     *Quimbara* continues to this very day to generate substantial income for Codigo through public performance rights, mechanical royalties from internet downloads, licensing for television and movies, the creation of derivative works, including remixes and adding new sounds to prior recordings during, and in addition to, the process of digitizing and/or remastering them, and from other sources of income.

20.     Yet, not only did Cepeda's untimely death deprive him of directly reaping the reward of his creativity; but, 44 years later, none of his heirs have received a single penny from Codigo or its predecessor Fania.

21. This state of affairs is particularly egregious in light the acknowledgment -- described in more detail below -- by Fania's CEO in 2009, when contacted by MCP, that *Quimbara* was the most popular song in Fania's catalogue.

### Reversion of *Quimbara* Renewal Copyright to His Daughters and Its Assignment to MCP

22. Because *Quimbara* was created prior to the effective date of the Copyright Act of 1976 (whose effective date is January 1, 1978) (the "1976 Act"), the provisions of the prior act, known as the Copyright Act of 1909 Act (the "1909 Act"), govern issues such as the term of copyright protection and ownership of the copyright.

23. Under the 1909 Act, the term of copyright protection was divided into two terms -- an initial term of 28 years and a potential renewal term of 28 years (whose length was later extended under the 1976 Act).

24. The 1909 Act contained a provision for the protection of an author's heirs under which the renewal term automatically reverted to certain specified statutory successors in the event that an author died before commencement of the renewal term (the "reversion provision").

25. The reversion provision nullified any prior grant of a renewal term when the author died before the renewal term.

26. Due to the death of Cepeda in 1974, all rights in the renewal term of *Quimbara* and other Cepeda compositions assigned to Fania pursuant to the 1972 Agreement, reverted to Cepeda's statutory successors.

27. The 1972 Agreement between Fania and Cepeda, insofar as it covered U.S. rights in the copyrights to Cepeda's composition, became null and void as of the first day of the renewal term -- January 1, 2003.

28.     Under the 1909 Act, when an author did not survive into the renewal term, the reversion provision automatically placed ownership of the renewal term in those of the author's widow and children who were alive on the first day of the renewal term.

29.     Cepeda never married, but had 3 children -- Luis Rios Romero, Mario Rios and Dhalma Laboy.

30.     Luis Rios died in 1981, and therefore only Mario Rios ("Maria") and Dhalma Laboy ("Dhalma"), who were alive on January 1, 2003 (and still are living), qualified as statutory successors entitled to the automatic reversion of the renewal term.

31.     In 2010 and 2011, Maria and Dhalma assigned all of their rights in the renewal term to *Quimbara* and 14 other Cepeda compositions to MCP so that MCP could endeavor to collect royalties owed to them. The 15 Cepeda compositions so assigned to MCP are as follows: *Acuyuye, Arranca, Can You Feel It, Dime Que Llegue a Tiempo, El Celoso, Esa Mujer, Homenaje a Celia Medley, Homenaje a la Salsa del Mundo, La Rumba Es Mia, Latin Rhythm, Magdalena Mi Amor, Magdalena Mi Amor (Quimbara) (sample/adaptation), Orizah Eh, Quimbara,* and *Yerbarito Moreno* (collectively referred to as "the Cepeda Compositions").

### MCP's Efforts to Collect Royalties On the Cepeda Compostions Owed By Codigo and Its Predecessors to the Cepeda Heirs

32.     In 2008, MCP was retained by an attorney for the Cepeda heirs to assist in collection of royalties owed under the 1972 Agreement.

33.     Sharall Churchill ("Ms. Churchill"), President of MCP, thereupon began to research which entity had then succeeded to the rights of Fania under the 1972 Agreement.

34.     Ms. Churchill ascertained that, in 2005, a company called Emusica Entertainment Group ("Emusica") had purchased the assets of Fania for a price reported to be in the $9-$12 million range.

35. On January 21, 2009, Ms. Churchill sent an email to Emusica stating the

following:

> By way of introduction, we have been retained to represent the estate of Luis
> Cepeda. According to ASCAP, we have been notified that you are claiming
> rights to Mr Cepeda's musical copyrights. On behalf of Mr Cepeda's estate, we
> hereby request a copy of the agreement as evidence of your claim since our client
> disagrees that there is any valid agreement.
>
> Under the Copyright Act, Mr Cepeda's estate were within their sole right to
> reclaim the musical compositions since he died within the initial 28 year term.
>
> Thank you for your cooperation. Please contact me at your earliest convenience.

36. Emusica responded in an email from Maria Lozano ("Ms. Lozano"), then

Director, Publishing and Licensing, Emusica Records, LLC and Emusica Publishing, LLC,

stating that after Emusica purchased the assets of Fania (including the Cepeda Compositions), it

began "an exhaustive search and inquiry in trying to locate the heirs of Mr. Cepeda," and further

stated that Emusica "will be happy to provide you with copy of the November 1, 1972 Exclusive

Songwriter Agreement between Mr. Cepeda and Fania Publishing under which we claim the

compositions" upon presentation of an appropriate court order regarding hereditary succession.

37. On January 27, 2009, Ms. Churchill responded in an email to Ms. Lozano as

follows:

> I will request the documents from the estate. This is his daughter, an heir of the
> body. It is the estates position that Mr Cepeda died within the first 28 years of the
> copyright and therefore is protected under the Copyright Act to reclaim his works.
> I will request documents and be back in touch.

38. At the end of January 2009, Ms. Lozano arranged for Ms. Churchill to have a

conference call (the "January 2009 Conference Call") in which, in addition to Ms. Lozano, the

participants were Giora W. Breil ("Mr, Breil"), CEO of Emusica, and Michael Rucker ("Mr.

Rucker"), then an Emusica executive and later the Chief Marketing Officer of Codigo.

39.     In the January 2009 Conference Call, the Emusica executives claimed to be pleased to have heard from Ms. Churchill, and stated that Emusica had money for the Cepeda heirs and that *Quimbara* was the biggest song in the Emusica catalogue.

40.     On April 17, 2009, Ms. Churchill again wrote to Ms. Lozano, attaching a copy of the Certificate of Appointment of Maria Rios, daughter of Cepeda, as administrator, and repeating her request for a copy of the 1972 Agreement with Fania and for royalty statements and accountings.

41.     In response, Ms. Lozano stated: Thank you for sending us the certificate of appointment of Maria Rios. We have forwarded it to our counsel in order to get proper instructions."

42.     On April 22, 2009, Ms. Churchill again emailed Ms. Lozano, with a copy to Mr. Breil, reiterating Ms. Churchill's request for a copy of the 1972 Agreement and yet again requesting royalty statements and accountings to date.

43.     However, in contrast to the representations of it executives in the January 2009 Conference Call, Emusica never provided royalty accountings or payments to Ms. Churchill on behalf of the Cepeda heirs or attempted to contact the probate court to pay accumulated earnings into an escrow account for the heirs.

44.     After April 22, 2009, Emusica ceased communicating directly with Ms. Churchill, and instead referred all communications to Emusica's outside counsel, Mark D. Kleiner, Esq. ("Mr. Kleiner"), then of the Fort Lauderdale law firm of Perlman Yevoli & Albright, P.L.

45.     On May 11, 2009, Ms. Churchill sent a letter (the "May 11 Letter") to Mr. Kleiner enclosing the Certificate of Appointment of Administrator from the New York State Surrogate's Court (Bronx County) and the Limited Power of Attorney issued to MCP by the Administrator.

8

In that letter, Ms. Churchill reiterated in her her previous requests to Emusica for a copy of the

original music publishing agreement and for royalty accountings.

46.     In the May 11 Letter, Ms. Churchill stated, *inter alia*, to Emusica's outside

counsel:

> As you [Mr. Kleiner] are aware, copyright law allows for the reversion of the
> rights to Mr. Cepeda to revert to his heirs automatically after the initial 28years
> since he died within 2 years of any so called agreement, which we have yet to see.
>
> At this point, after 37 years of inactivity and no accountings, it seems appropriate
> and reasonable for your clients to cooperate for the reversion of all of the
> copyrights to the heirs. It is the only intelligent solution and the law.

47.     Instead of complying with the applicable requirements of copyright law, Mr.

Kleiner, on behalf of Emusica, responded in a June 18, 2009 letter (the "June 18 Letter") to Ms.

Churchill with the following misrepresentation of the law:

> Your [Ms. Churchill's] claim for reversionary rights is an inaccurate
> representation of the law. The applicable law is the 1909 copyright act,
> accordingly, the initial 28 year term expired December 31, 2000. Any claim for
> reversion would have had to been made by written notice to Fania no less than 2
> years prior to expiration of the term. No such notice was ever received; therefore,
> any claim now for reversionary rights is untimely. Emusica will vigorously
> defend any claims and we are confident the Emusica will assuredly prevail. Any
> lawsuit based upon such groundless claims would be sanctionable as having been
> brought in bad faith.

48.     Emusica's June 18 Letter, through its outside counsel, Mr. Kleiner, constitutes a

misrepresentation of the law designed to mislead a layperson, Ms. Churchill, as to the rights of

the Cepeda heirs she represented, by making *in terrorem* threats based on either intentional

misstatements of the law or an equivalent reckless disregard of the applicable provisions of

copyright law.

49.     Among Mr. Kleiner's misstatements of law in the June 18 Letter is this most

salient one:  his reference to so-called requirement for "written notice to Fania no less than 2

years prior to expiration of the term" has nothing whatsoever to do with the reversionary provisions concerning the renewal term under the 1909 Act; instead, he was either mistakenly referring to, or intentionally misrepresenting, as applicable, provisions under the 1976 Act concerning when and how a prior transfer of copyright could be terminated.

50.    Because the *Quimbara* copyright arose under the 1909 Act and Cepeda pre-deceased the commencement of the renewal term, no notice whatsoever was required for the renewal term to revert to his statutory successors.

51.    Therefore, Mr. Kleiner, on behalf of Emuscia, issued a blatantly misleading threat to seek sanctions on Ms. Churchill, and on the Cepeda heirs she was represented, in order to discourage them from for enforcing their automatic reversionary rights in the renewal terms of the Cepeda Compositions.

### Codigo Takes Over, Reviving Fania and Quimbara, But Nothing Changes for Cepeda Heirs

52.    As set forth above, one of the participants in the January 2009 Conference Call was Michael Rucker ("Mr. Rucker"), then an executive of Emusica and later to become the Chief Marketing Officer for Codigo.

53.    On information and belief, therefore, Mr. Rucker was aware, or should have been aware, of the communications between Ms. Churchill and Emusica, and between Ms. Churchill and Emusica's outside counsel, Mr. Kleiner, during the period January - May 2009.

54.    Around 2009, an investment firm called Signal Equity Partners, operating under the name Codigo Group, purchased Fania's assets, including the Cepeda Compositions.

55.    After Codigo's acquisition of the Fania assets, Michael Rucker, as Codigo's Chief Marketing Officer, led a resurgence of Fania classic recordings, including recordings of *Quimbara*.

56.     Codigo's marketing and distribution of Fania recordings, including *Quimbara*, included a variety of new efforts, including digitization, remastering, remixing, rerecording and adding new instruments and sounds to the original recordings.

57.     Codigo's new products were designed to reposition Fania recordings for the digital age. In doing so, on information and belief, certain of the new products went beyond mere digitization or remastering and instead made significant enough changes from the original copyright term recordings to constitute unauthorized -- and, hence, infringing -- new derivative works made during the renewal term.

58.     These developments were confirmed by Mr. Rucker in a January 2, 2015 interview on CNBC's "On the Money" segment entitled "The Day the Music Revived." In that videotaped interview, he described an ongoing remixing process while one of the recording engineers was shown pointing to his brother in the recording booth playing conga drums so that new sounds could be added to the original recording. In describing this remixing process, Mr. Rucker stated that it was "the perfect example of taking the best of the past with the best of today to create something new. That's what we're doing here."

59.     In that same CNBC segment, the narrator described Codigo's marketing plan as focusing on the digital: "Its [Codigo's] classic tracks are being remixed for a new consumer."

60.     Codigo's digital marketing strategy, including its remixing and creation of (unauthorized) derivative works during the renewal terms of the Cepeda Compositions, resulted in substantial profits beginning in 2013. According to an article on the business website FastCompany.com, "2013 was the label's first profitable year since its resurrection. It racked up sales of roughly 250,000 albums, most of them downloads, and the move to digital has been so

successful that Fania has almost eliminated physical product altogether." Yet none of Codigo's resulting profits were shared with the Cepeda heirs.

## Codigo Enters Into Administration Agreements With Universal and Downtown

61. Codigo entered into various administration agreements with Universal Music Publishing Group (UMPG), including an amendment dated as of the 1st day of July 2010 and lasting until at least June 30, 2013 (the "UMPG Administration Agreement").

62. Pursuant to the UMPG Administration Agreement, Codigo appointed UMPG during the term as "Owner's agent to be the sole and exclusive administrator of all musical compositions written, owned, controlled and/or acquired, in whole or in part, prior to or during the Term, by Owner and/or any other music publishing company owned and/or controlled by Owner . . . ."

63. The grant of rights to UMPG pursuant to the UMPG Administration Agreement included the "sole and exclusive right to" license the subject Compositions, which included the Cepeda Compositions; to administer and grant rights in the Compositions; to print, publish and sell printed copies of the Compositions; and to collect monies earned with respect to the Compositions.

64. After learning that UMPG was Codigo's sole and exclusive administrator for Codigo's owned or controlled musical compositions, including the Cepeda Compositions, MCP, through its outside counsel, sent a claim letter, dated May 9, 2012 letter (via certified mail/return receipt requested -- Receipt No. 7011 1150 0000 0684 8213) to UMPG (the "May 9, 2012 Claim Letter").

65.     The May 9, 2012 Claim Letter was addressed to: Mr. David Kokakis, Senior Vice President, Head of Business & Legal Affairs, Universal Music Publishing Group, 2100 Colorado Avenue, Santa Monica, California 90404.

66.     The May 9, 2012 Claim Letter set forth MCP's claims, on behalf of Cepeda's statutory successors under the 1909 Copyright Act, to the automatic reversion of the rights in the renewal terms to the U.S. Copyrights in *Quimbara* and the other Cepeda Compositions, and demanded an accounting and payment of royalties due, and damages for copyright infringement.

67.     The May 9, 2012 Claim Letter also demanded a return of foreign rights in the Cepeda Compostions and damages for material breach of the portion of the 1972 Agreement relating to foreign rights (which were not subject to the automatic reversion under the 1909 Act because U.S. Copyright Law does not have extraterritorial application).

68.     Upon information and belief, as Codigo's sole and exclusive administrator of Codigo's musical compositions, including the Cepeda Compositions, UMPG was duty bound to forward the May 9, 2012 Claim Letter to Codigo and, upon information and belief, did forward the May 9, 2012 Claim Letter to Codigo.

69.     MCP's May 9, 2012 Claim Letter to UMPG was met with a resounding silence from both UMPG and Codigo. At no time after May 9, 2012 has either UMPG or Codigo provided any written or oral response to the May 9, 2012 Claim Letter; nor has UMPG or Codigo provided any accountings, royalty statements or royalty payments in response to the May 9, 2012 Claim Letter.

70.     On information and belief, effective July 1, 2015, and continuing for at least 3 years thereafter, Downtown has served as Codigo's sole administrator for Codigo's owned or controlled Compositions, including the Cepeda Compositions, and as Codigo's exclusive

13

administrator has had the same, or a comparable, grant of exclusive rights as those provided by Codigo to UMPG in the UMPG Administration Agreement.

71.     On January 24, 2018, MCP, through its outside counsel, sent a claim letter to Downtown, a copy of which was subsequently delivered to Codigo, making the same demands of Downtown and Codigo as MCP had made in the May 9, 2012 Claim Letter to UMPG, including, without limitation, for an acknowledgment by Codigo and Downtown of the automatic reversion of the U.S. renewal terms to Cepeda's statutory successors, copyright monetary remedies, and a return of the grant of foreign rights under the 1972 Agreement.

72.     On January 27, 2018, MCP, through its outside counsel, made certain corrections to the January 24 letter, but maintained the same claims for relief and demands. (The January 24, 2018 letter, as modified by the January 27 letter, are referred to collectively herein as the "January 2018 Claim Letter.")

73.     Although, subsequent to the January 2018 Claim Letter, discussions ensued between MCP, on the one hand, and Codigo and Downtown, the substance of any such discussions are subject to Fed. R. Evid. 408 and therefore shall not be referred to herein.

74.     As of the date of this Complaint, neither Codigo nor Downtown has made any royalty accounting or payment to MCP, and MCP's claims against Codigo and Downtown have been explicitly and fully reserved.

### Infringement of *Quimbara* Copyright

75.     MCP, as assignee of Cepeda's statutory successors under the 1909 Act, and as claimant, has received Registration No. RE 932-276 for the musical composition *Quimbara*, with an effective date of April 11, 2016, and later received a supplementary registration (RE 932 -

387) for *Quimbara* clarifying that Cepeda's daughters Maria and Dhalma are the only statutory successors to the renewal term in *Quimbara*.

76.     The above-described acts of reproduction, preparation of derivative works, display, public performance, distribution and sale of *Quimbara* and of sound recordings, audiovisual works and digital works embodying *Quimbara*, to the extent that they have occurred on or after January 1, 2003 (the commencement of the renewal term) constitute copyright infringement, as set forth in 17 U.S.C. § 101 et seq.

77.     As a result of Defendants' acts of copyright infringement, Plaintiff is entitled to injunctive relief, and an accounting of Defendants' profits and/or Plaintiff's actual damages, and, to the extent that such infringing conduct has occurred subsequent to the effective date of the registration for *Quimbara*, to statutory damages, and/or attorneys' fees,

## SECOND CLAIM FOR RELIEF AGAINST ALL DEFENDANTS

### Copyright Infringement of the Musical Compositions
### *Arranca, Dime Si Llegue A Tiempo, and Magadalena Mi Amor*

78.     Plaintiff repeats and realleges the allegations in paragraphs 1 - 77 as if fully set forth herein.

79.     During or before 1974, Cepeda wrote the musical compositions *Arranca, Dime Si Llegue A Tiempo* ("*Dime*"), *and Magadalena Mi Amor* ("*Magdalena*").

80.     Pursuant to the 1972 Agreement, Cepeda granted to Codigo's predecessor, Fania, all rights in *Arranca, Dime* and *Magdalena Mi Amor*.

81.     Because Cepeda died before the renewal term began under the 1909 Act, the U.S. renewal term rights automatically reverted to his statutory successors under the 1909 Act, his

daughters Maria and Dhalma, who were the only statutory successors alive at the commencement of the renewal term.

82.     Maria and Dhalma have assigned all of their rights in the U.S. copyright renewal terms to MCP.

83.     MCP, as copyright claimant by written assignment, has received from the U.S. Copyright Office the following copyright registrations, and effective dates, for these compositions:

For *Arranca*:   Registration No. PAu 3900992, effective April 4, 2018

For *Dime Si Llegue A Tiempo*:   Registration No. PAu 3900995, effective April 4, 2018

For *Magdalena Mi Amor*:   Registration No. PAu 3900992, effective April 4, 2018

84.     Upon information and belief, since the commencement of the U.S. renewal terms for these compositions, Codigo, and Downtown as agent and exclusive administrator for Codigo, have engaged in acts with respect to these compositions constituting copyright infringement, as set forth in 17 U.S.C. § 101 et seq.

85.     As a result of Defendants' acts of copyright infringement, Plaintiff is entitled to injunctive relief, and an accounting of Defendants' profits and/or Plaintiff's actual damages, and, to the extent that such infringing conduct has occurred, or hereafter occurs, subsequent to the effective dates of the registrations for these compositions, to statutory damages and attorneys' fees.

## THIRD CLAIM FOR RELIEF AGAINST ALL DEFENDANTS

**Copyright Infringement of the Musical Compositions Entitled *Can You Feel It, El Celoso, Esa Mujer, Homenaje a Celia Medley, Homenaje a la Salsa del Mundo, La Rumba Es Mia, and Orizah Eh* (collectively referred to as the "Compositions Pending Registration")**

86.     Plaintiff repeats and realleges the allegations in paragraphs 1 - 85 as if fully set

forth herein.

87.     The above referenced Compositions Pending Registration were all created by Cepeda during or prior to 1974.

88.     Pursuant to the 1972 Agreement, Codigo's predecessor, Fania, acquired all rights in the copyrights to these compositions.

89.     Due to Cepeda's death prior to the commencement in the U.S. renewal terms for these compositions, the renewal terms in them automatically reverted to Cepeda's statutory successors alive at the commencement of the renewal term, namely, Maria and Dhalma.

90.     Maria and Dhalma have assigned all of their rights in the renewal terms to these compositions to MCP.

91.     On July 9, 2018, MCP, as assignee of Maria and Dhalma, filed applications as copyright claimant to register copyrights in these compositions.

92.     On July 9, 2018, MCP has received from the Copyright Office an acknowledgment of the filing of these applications for registration, and the Copyright Office has assigned the following Case Nos. to these applications:

| | |
|---|---|
| *Can You Feel It* | Case # 1-6752076032 |
| *El Celoso* | Case # 1-6751996325 |
| *Esa Mujer* | Case # 1-6751921802 |
| *Homenaje a la Salsa del Mundo* | Case # 1-6752159146 |
| *Homenaje a Celia Medley* | Case # 1-6752120171 |
| *La Rumba Es Mia* | Case # 1-6752119896 |
| *Orizah Eh* | Case # 1-6751921415 |

93.     Upon information and belief, during the renewal terms for these Compositions Pending Registration, Codigo and/or Downtown, as agent and exclusive administrator for

Codigo, have exploited these compositions despite the reversion of their renewal terms to the statutory successors and without authorization from them or their assignee, MCP.

94.     Upon information and belief, the aforesaid conduct of Codigo and/or Downtown constitutes copyright infringement, as set forth in 17 U.S.C. § 101 et seq.

95.     As a result of Defendants' acts of copyright infringement, Plaintiff is entitled to injunctive relief, and an accounting of Defendants' profits and/or Plaintiff's actual damages.

### FOURTH CLAIM FOR RELIEF AGAINST DEFENDANT CODIGO

### For Material Breach of the 1972 Agreement and, at MCP's Election, For Damages and Termination of the Grant of Foreign Rights Therein or For Rescission

96.     Plaintiff repeats and realleges the allegations in paragraphs 1 - 95 as if fully set forth herein.

97.     Because Cepeda's 1972 Agreement with Fania included a grant of exclusive worldwide rights in all Cepeda Compositions, but only the rights in the U.S. renewal terms reverted to Maria and Dhalma, the grant of foreign rights therein has remained in effect.

98.     As set forth above, from the inception of the 1972 Agreement, and for the ensuing 46 years to date, neither Fania nor its successor, Codigo, has provided any royalty accountings to Cepeda or his heirs nor paid a penny to them, despite repeated requests and demands by MCP on several occasions.

99.     Not only did Fania and Codigo completely default on their obligations to make periodic accountings and to make royalty payments to Cepeda, Maria, Dhalma, Carmen and MCP, but Codigo's outside counsel affirmatively mislead MCP as to a purported notice requirement to obtain their rights back.

100.     In addition to having received assignments from Maria and Dhalma of rights under the 1972 Agreement, including their right to receive a share of royalties from proceeds of

18

foreign exploitation of the Cepeda Compositons, MCP has also received a similar assignment with respect foreign proceeds from the only other Cepeda heir, Carmen Almodovar.

101.    Although not a statutory successor under the 1909 Act because she is not a child of the author, Carmen Almodovar, as a half sister of Cepeda's deceased son, Luis Cepeda, has an interest in the proceeds from the grant of foreign rights in the 1972 Agreement.

102.    As assignee of the rights and remedies of Cepeda's heirs under the grant of foreign rights in the 1972 Agreement, MCP has sought to obtain a voluntary return of those foreign rights based upon Codigo's, and Fania's complete failure to abide by the central and only consideration provided to Cepeda, and his heirs, under Agreement -- namely, the receipt of royalties in exchange for the grant of exclusive rights in his compositions.

103.    By virtue of their 46 years of reaping the rewards of the Cepeda Compositions while ignoring their royalty obligations to Cepeda and his heirs, Fania and Cepeda have materially breached the 1972 Agreement in such a blatant and fundamental way that they have destroyed its essential purpose.

104.    As a result of Fania and Codigo's aforesaid conduct, MCP, as assignee of Cepeda's heirs, is entitled, at its election, either to damages and termination of the grant of foreign rights or to rescission of the grant of foreign rights in the 1972 Agreement.

### FIFTH CLAIM FOR RELIEF

### For Declaratory Judgment Under 28 U.S.C. § 2201

105.    Plaintiff repeats and realleges the allegations in paragraphs 1 - 104 as if fully set forth herein.

106.    An actual controversy exists between plaintiff and defendants with respect to the foregoing claims for relief.

107.    Plaintiff requests that this Court issue a declaratory judgment that all rights in the

U.S. copyright renewal terms in the Cepeda Compositions have reverted to Cepeda's statutory

successors, Maria and Dhalma, and have been duly assigned to MCP, which therefore is the only

entity now, and for the duration of the renewal terms, entitled to exploit the copyrights in the

Cepeda Compositions directly or through license, assignment or in any other manner; and that, as

of January 1, 2013, Codigo ceased to have any rights in the U.S. renewal terms to the Cepeda

Compositions.

108.    Plaintiff further respectfully requests that this Court issue a declaratory judgment

stating that, as the result of Fania's and Codigo's material breach of the 1972 Agreement, MCP,

as assignee of the Cepeda heirs, is entitled, at its election, to terminate or rescind the grant of

foreign rights contained therein.

WHEREFORE, Plaintiff prays for judgment against Defendants and each of them as set

forth above in the concluding paragraphs in the FIRST through FOURTH CLAIMS FOR

RELIEF (*viz.*, paragraph numbers 77, 85, 95 and 104), and as set forth above in paragraphs 107

and 108 of the FIFTH CLAIM FOR RELIEF; for the costs incurred by plaintiff in this action;

and for such other and further relief as the court deems just and proper.

Respectfully submitted,

THE LAW OFFICE OF ROBERT J. BERNSTEIN

Dated: July 11, 2018            By:_____s/RJB/_____
                                    Robert J. Bernstein (RB 4230)

*Attorney For Plaintiff*
Media Creature Properties LLC

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury.

Respectfully submitted,

THE LAW OFFICE OF ROBERT J. BERNSTEIN

Dated: July 11, 2018             By:_____s/RJB/_____
                                      Robert J. Bernstein (RB 4230)

*Attorney For Plaintiff*
Media Creature Properties LLC